**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, § § § | |
| § | Case No:_____ |
| Plaintiff, § | |
| § | |
| v. § | |
| § | |
| BANK OF ANTIGUA; EASTERN CARIBBEAN § | |
| CENTRAL BANK; ANTIGUA COMMERCIAL BANK; § | |
| ST. KITTS-NEVIS-ANGUILLA NATIONAL BANK § | |
| LTD.; EASTERN CARIBBEAN FINANCIAL § | |
| HOLDINGS COMPANY LTD; NATIONAL § | |
| COMMERCIAL BANK (SVG) LTD; EASTERN § | |
| CARIBBEAN AMALGAMATED BANK; AND § | |
| NATIONAL BANK OF DOMINICA LTD; AND § | |
| ANTIGUA AND BARBUDA, | |
| | |
| Defendants. | |

---

## ORIGINAL COMPLAINT

---

THE OFFICIAL STANFORD INVESTORS COMMITTEE (the "Committee"),

on its own behalf and as assignee of certain claims and causes of action of RALPH S.

JANVEY, AS COURT-APPOINTED RECEIVER (the "Receiver") for the various

entities that were owned and controlled by R. Allen Stanford ("Stanford", and

collectively, the "Stanford Entities"), as and for its Complaint against Defendants, Bank

of Antigua, also known as Eastern Caribbean Amalgamated Bank ("Bank of Antigua")[1],

Eastern Caribbean Central Bank ("ECCB"), Antigua Commercial Bank, St. Kitts-Nevis-

Anguilla National Bank Ltd.,  Eastern Caribbean Financial Holdings Company Ltd.,

National Commercial Bank (SVG) Ltd., National Bank Of Dominica Ltd. and Antigua

and Barbuda ("Antigua") (Antigua Commercial Bank, St. Kitts-Nevis-Anguilla National

Bank Ltd., Eastern Caribbean Financial Holdings Company Ltd., National Commercial

Bank (SVG) Ltd., and National Bank of Dominica Ltd. are referred to collectively herein

as the "Bank Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to recover a portion of the losses suffered by thousands of

innocent and unsuspecting investors from around the world who entrusted their money to

R. Allen Stanford, Stanford International Bank, Ltd. ("SIBL"), and other entities

collectively marketed as being part of what was commonly referred to as the Stanford

Financial Group ("SFG").  Stanford has now been exposed as being one of the most

notorious, fraudulent, corrupt, and criminal enterprises in history.[2]

2.      As demonstrated during his criminal trial, Stanford did not act alone in

stealing billions from the victims of this scheme.  In addition to being directly victimized

by Allen Stanford and his fellow officers and employees at Stanford, Stanford investors

were also victims of Stanford's various collaborators and co-conspirators, including

---

[1] As used herein, "Bank of Antigua" means the Bank of Antigua and the Eastern Caribbean Amalgamated Bank, which became the successor entity of the Bank of Antigua.
[2] As used herein, "Stanford" means R. Allen Stanford and the entities that comprised the Stanford Financial Group, including those entities' parents, subsidiaries, affiliates, officers, directors, employees, and agents.

individuals and entities who have sought to illegally profit by misappropriating or retaining Stanford assets, both before and after the disclosure of this massive fraud by the Securities and Exchange Commission ("SEC") in early 2009.  Those assets should rightly be used to provide at least some measure of compensation to defrauded Stanford investors.

3.     Specifically, this action seeks redress for a second brazen act of thievery from Stanford investors, perpetrated in part even after the disclosure of the Stanford fraud in February 2009, and the appointment of a receiver to marshal and distribute Stanford's assets, in the United States and Antigua.  This theft was perpetrated not only by Stanford, but also by the Bank of Antigua's putative regulator, ECCB, the corrupt government of Antigua, and by all too willing co-conspirators at Caribbean-based financial institutions which, unless this Court acts, will have obtained a multi-million dollar windfall at the expense of Stanford's many victims.

4.     Shortly after the SEC commenced civil enforcement proceedings against Allen Stanford and certain other individuals and entities alleged to be part of the Stanford fraud (on or about February 17, 2009), ECCB, in concert with Antigua and the Bank Defendants, seized the Bank of Antigua, and in so doing, orchestrated the intentional and fraudulent misappropriation of the Bank of Antigua and all of its assets from Stanford's victims.  These assets were and remain subject to this Court's Receivership and must be returned to the Receivership Estate.

5.     The seizure of the Bank of Antigua by the Defendants also constituted an illegal attempt to retain the vast sums of money stolen from Stanford's investors and

funneled to Antigua through the concerted and corrupt actions of Stanford and its partner, Antigua itself.  For well over a decade, Antigua was a prime participant in, and beneficiary of, the Stanford Ponzi scheme, and actively protected and shielded Stanford's criminal enterprise from real regulatory scrutiny[3].

6.      Prior to its seizure by Defendant ECCB in February 2009, Bank of Antigua was wholly-owned, either directly or indirectly by Stanford, and operated through branches on the island of Antigua and through a representative office in Mexico. By all accounts, including its annual reports and financial statements, and statements issued by the ECCB just one day prior to the seizure, Bank of Antigua was a successful, valuable banking institution.  This action seeks to recover Stanford investors' stolen assets that are now in the Defendants' possession or under their control, as a result of: (i) the fraudulent transfer of assets from SIBL and Stanford (and in reality from SIBL and Stanford's investors and creditors) to the Bank of Antigua, as an integral part of the Stanford investment fraud; and (ii) the subsequent fraudulent transfer of ownership of the Bank of Antigua itself to the Defendants, ***without the legally mandated payment of any compensation to the plaintiff victims of the Stanford fraud and in violation of this Court's Receivership Orders***.  The considerable value of the Bank of Antigua, believed to be in the tens or hundreds of millions of dollars, should be distributed as compensation to its rightful owners, Stanford's victims and creditors. That value should not be retained by Stanford's co-conspirators under the guise of "Caribbean style" bank regulation, or

---

[3] Concurrent with this action, Plaintiff commenced an action against Antigua in the District Court for the Southern District of Texas, entitled *The Official Stanford Investors Committee, on its own behalf and as assignee of Ralph S. Janvey, In His Capacity As Court-Appointed Receiver v. Antigua and Barbuda*, seeking damages for Antigua's complicity in the Stanford fraud.

misappropriated by what appear to be otherwise innocent third party financial institutions, as a gift from Caribbean regulators and politicians.

7.     Antigua's intentions were made clear in a candid statement by one of its top officials.  In February 2009, after Antigua illegally seized valuable and extensive real property interests owned by Stanford on the island (also without paying compensation to Stanford's victims in accordance with its own laws), Antigua's Prime Minister, Baldwin Spencer, admitted that the seizure of those properties was a tactic to facilitate his country's further theft from Stanford's international investors and creditors: "We have to give ourselves a bargaining chip, so when the receivers come they have to deal with the government of Antigua and Barbuda," the Prime Minster told the Antiguan House of Representatives after it approved the land takeover measure.

8.     *All* of Stanford's innocent creditors – primarily the defrauded investors of SIBL – have a right to recover their losses from whatever assets were or are owned by Stanford.  This action seeks redress on behalf of the the Committee and the Receivership Estate for the Defendants' self-serving and self-dealing misappropriation of assets rightfully belonging to SIBL investors and the Receivership Estates, including the Bank of Antigua.

## PARTIES

9.     On February 16, 2009, the SEC commenced a lawsuit in this Court (*SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N, the "SEC Action") against Stanford, two associates, James M. Davis ("Davis") and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group

Company, and Stanford Capital Management, LLC. The SEC alleges, in its Second

Amended Complaint filed on January 8, 2010, that Stanford and various Stanford-related

entities perpetrated a multi-billion-dollar fraudulent scheme by (1) promising high rates

of return on CDs that exceeded those available through true certificates of deposit offered

by traditional banks; and (2) selling a proprietary mutual fund wrap program known as

Stanford Allocation Strategy using materially false and misleading historical performance

data.  SEC Action Am. Comp. ¶¶ 4, 7 [Doc. 952].

       10.    The Court found good cause to believe that Stanford and the Stanford

Entities violated the federal securities laws.  Accordingly, on February 16, 2009, the

Court entered an order appointing Ralph S. Janvey Receiver over all the assets of

Stanford, associated companies, and all the entities they owned or controlled.  SEC

Action, Order Appointing Receiver (the "Receivership Order") [Doc. 10].  ***The***

***Receivership Order also empowered the Receiver to marshal and preserve the assets of***

***the Receivership Estates, including the Bank of Antigua, and address outstanding***

***claims and liabilities***.  The provisions of the original Receivership Order are now

embodied in the Second Amended Order Appointing Receiver dated July 19, 2010 [Doc.

1130].  The Receiver is empowered by the Receivership Order and by applicable law to

bring actions for the benefit of the Receivership Estates and on behalf of investors in

SIBL CDs.

       11.    By Order dated August 10, 2010, this Court authorized and approved the

formation of the Committee, and designated the Committee to represent the interests of

SIBL depositors in these and related proceedings and, under certain circumstances, to

bring and take legal actions for the benefit of SIBL depositors and on behalf of the Receiver and the Receivership Estates.  *See* SEC Action, Order Appointing Committee (the "Committee Order") [Doc. 1149].  The Committee and Receiver subsequently entered into an agreement regarding the prosecution of claims against third-parties (the "Agreement"), which was approved by Order of the Court dated February 15, 2011.  *See* SEC Action [Doc. No. 1267].

12.     As required by the terms of the Committee Order and the Agreement, the Committee is, and has been, cooperating with the Receiver concerning the identification and prosecution of actions under fraudulent transfer, breach of contract, and other legal theories for the benefit of the Receivership Estates and SIBL investors.  *See* Committee Order at ¶¶ 7, 8.

13.     The Committee brings this action pursuant to its authority under the Committee Order and as assignee for the Receiver.

14.     Prior to its seizure by ECCB, Defendant Bank of Antigua was owned directly or indirectly, by Allen Stanford.  At all relevant times, Bank of Antigua has been nominally headquartered in Antigua but, upon information and belief, prior to its seizure by ECCB, all or substantially all of the senior management functions related to the Bank of Antigua were directed from Stanford's Houston, Texas headquarters and elsewhere in the United States by officers of Stanford, including but not limited to, Allen Stanford and James Davis.

15.     ECCB was established in or about October 1983.  It is the Monetary Authority for a group of eight island economies: Anguilla, Antigua and Barbuda, the

Commonwealth of Dominica, Grenada, Montserrat, St Kitts and Nevis, St. Lucia, and St. Vincent and the Grenadines (the "Participating Governments").  The stated purposes of the ECCB are: "to regulate the availability of money and credit; to promote and maintain monetary stability; to promote credit and exchange conditions and a sound financial structure conducive to the balanced growth and development of the economies of the territories of the Participating Governments; to actively promote through means consistent with its other objectives the economic development of the territories of the Participating Governments."

16.     Antigua is an independent state within the British Commonwealth of Nations.   After the ECCB's seizure of the Bank of Antigua (which, as described below, was accomplished under the direction of Antigua itself), ECCB transferred part ownership of the Bank of Antigua to Defendant Antigua, which became a forty percent (40%) shareholder of the Bank of Antigua until such time as it transferred fifteen percent (15%) ownership to Defendant Antigua Commercial Bank.

17.     Upon information and belief, Defendant Antigua Commercial Bank is a corporation with a principal place of business at Thames and St. Marys Streets, St. Johns, Antigua.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant Antigua, which in turn transferred part ownership to Antigua Commercial Bank, which became a fifteen percent (15%) shareholder of the Bank of Antigua.

18.     Upon information and belief, Defendant St. Kitts-Nevis-Anguilla National Bank Ltd. is a corporation with a principal place of business at Central Street, Basseterre,

St. Kitts, West Indies.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant St. Kitts-Nevis-Anguilla National Bank Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

19.     Upon information and belief, Defendant Eastern Caribbean Financial Holdings Company Ltd. is a corporation with a principal place of business at #1 Bridge Street, Saint Lucia, West Indies.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant Eastern Caribbean Financial Holding Company Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

20.     Upon information and belief, Defendant National Commercial Bank (SVG) Ltd. is a corporation with a principal place of business at Bedford Street, Kingstown, St. Vincent and the Grenadines.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to Defendant National Commercial Bank (SVG) Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

21.     Upon information and belief, Defendant National Bank of Dominica Ltd. is a corporation with a principal place of business at Hillsborough Street, Roseau Dominica.  After the ECCB's seizure of the Bank of Antigua, ECCB transferred part ownership of the Bank of Antigua to National Bank of Dominica Ltd., which became a fifteen percent (15%) shareholder of the Bank of Antigua.

## RELEVANT NON-PARTIES

22.     At all relevant times, SIBL was a private, offshore bank with offices on the island of Antigua and elsewhere.  SIBL was organized in Montserrat, originally under the name of Guardian International Bank.  In or about 1989, SIBL's principal banking location was moved to Antigua.  SIBL was at all relevant times operated and controlled from Houston, Texas.

23.     From 2001 to 2008, SIBL marketed its primary investment product, certificates of deposit ("CDs"), and promised higher rates of return on those CDs than were generally offered at banks in the United States.  In its 2007 Annual Report, SIBL stated that it had approximately $6.7 billion worth of CD deposits, and more than $7 billion in total assets.  In its December, 2008 Monthly Report, SIBL purported to have more than 30,000 clients from 131 countries, representing $8.5 billion in assets.

24.     Stanford Group Company ("SGC"), a Houston-based company, was founded in or about 1995.  SGC was registered with the SEC as a broker-dealer and investment advisor.  SGC also was a member of the Securities Investor Protection Corporation, and the Financial Industry Regulatory Agency (formerly, the National Association of Securities Dealers).  SGC, and the financial advisers employed by SGC, promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States.  The principal purpose and focus of Stanford's combined operations was to attract and funnel outside investor funds into the Stanford companies through the sale of CDs issued by SIBL.

25.     Allen Stanford founded and owned Stanford Financial Group ("SFG") and its affiliated companies, including SIBL and SGC, through a holding company.  Allen Stanford was the chairman of SIBL's Board of Directors and a member of SIBL's Investment Committee.

26.     The Financial Services Regulatory Commission of Antigua (the "FSRC") was created by and, at all relevant times, existed under the authority of, Antigua's International Business Corporations Act (the "IBC Act").  The FSRC is an agency and/or instrumentality of Antigua.  Upon information and belief, the FSRC was dominated and controlled by Antiguan government officials.

27.     During certain relevant times described below, Leroy King ("King") was the Administrator and Chief Executive Officer for the FSRC.  King, among other things, was supposedly responsible for FSRC's (and, thus, Antigua's) oversight of SIBL's investment portfolio, including the review of SIBL's financial reports, and the response to requests by foreign regulators, including the SEC, for information and documents regarding SIBL's operations.  As the SEC alleged in its Second Amended Complaint in the SEC Action, however, King "facilitated the Ponzi scheme by ensuring that the FSRC 'looked the other way' and conducted sham audits and examinations of [SIBL's] books and records.  In exchange for bribes paid to him over a period of several years, King made sure that the FSRC did not examine [SIBL's] investment portfolio.  King also provided Stanford with access to the FSRC's confidential regulatory files."  [SEC Second Amended Complaint at p. 3]

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action, and venue is proper, under

Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act

(15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure

(28 U.S.C. § 754).

29.     Further, as the Court that appointed the Receiver and the Committee, this

Court has jurisdiction over any claim brought by either of them to execute their duties.

30.     Further, this Court has personal jurisdiction over Defendants pursuant to

Fed. R. Civ. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.  Upon information and belief,

within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the

Receiver filed the original SEC Complaint and the Order appointing Receiver in all

United States District Courts, giving this Court *in rem* and *in personam* jurisdiction in

every other district where the Complaint and Order were filed.

31.     The Court also has personal jurisdiction over Defendants under the Texas

Long-Arm Statute because Defendants regularly conducted business in Texas and/or

engaged in continuous and systematic activities within Texas; committed tortious acts

directed towards Texas; and fraudulently transferred and/or aided and abetted in

fraudulently transferring property of Texas residents, or did so in a manner foreseeably

harming Texas residents.

32.     Finally, Texas was the center of main interest of the Stanford Entities with

whom Defendants regularly conducted business.  *See* Order in Civil Action No. 3:09-CV-

0721-N [Doc. 176] (granting conditional and limited recognition to the Antiguan Joint Liquidators).

## FACTUAL ALLEGATIONS

### The Underlying Fraud[4]

33.     Stanford's business was a massive Ponzi scheme in which Stanford misappropriated billions of dollars, falsified SIBL's financial statements, and concealed Stanford's conduct from customers, prospective customers, and regulators in the United States and elsewhere.

34.     Among other things, Stanford represented to investors that:

(i)      the investors' assets were safe and secure because SIBL invested in a "globally diversified portfolio" of "marketable securities;"

(ii)     SIBL had averaged double-digit returns on its investments for over 15 years;

(iii)    Allen Stanford had solidified SIBL's capital position in late 2008 by infusing $541 million in capital into the bank;

(iv)    SIBL's multi-billion dollar portfolio was managed by a "global network of portfolio managers" and "monitored" by a team of SFG analysts in Memphis, Tennessee;

---

[4] The allegations in this sub-section are based upon the allegations made by the SEC in its complaint (the "Second Amended Complaint") in the civil enforcement action *SEC v. Stanford International Bank, Ltd.*, *et al.*, Case No. 09-cv-0298-N (N.D. Tex) (the "SEC Action"), the indictment in *United States v. Stanford, et al.*, Case No. 09-cr-342 (S.D. Tex), the public materials cited therein, testimony at Stanford's criminal trial, and other public materials and media reports.

       (v)      SIBL, in early 2009, was stronger than at any time in its history; and

       (vi)     SIBL did not have exposure to losses from investments in the fraudulent Ponzi scheme that had been operated by Bernard L. Madoff (the "Madoff Scheme").

35.     More fundamentally, Stanford represented that SIBL was a legitimate and duly audited and regulated banking institution, which made money by investing assets and generating investment returns.

36.     Each of those representations were materially false and misleading, and were an integral part of Stanford's "business", which was really a massive Ponzi scheme. In fact, by February 2009, Stanford had misappropriated billions of dollars from unsuspecting investors.

### Antigua's Participation in the Fraud

37.     Antigua entered into a corrupt and illegal commercial partnership with Stanford, in which Antigua became an integral part of, and beneficiary of, Stanford's multi-billion dollar international fraudulent conspiracy.

38.     During the relevant period, Stanford transferred to Antigua vast sums of money stolen from CD investors under the guise of commercial loans, and entered into a number of business transactions with Antigua, all with the purpose and effect of prolonging, and making Antigua a full partner in, Stanford's criminal enterprise, receiving substantial proceeds from the fraud.

39.     Significantly, many of the "loans" made to Antigua by were simply forgiven by Stanford.  Others were assigned and/or transferred from the Stanford entities that originated the loans to Bank of Antigua without any consideration in the weeks before his Ponzi scheme was uncovered.   The loans transferred to Bank of Antigua include, but are not limited to, loan numbers 700535, 701070, 701133 and 702536, in the aggregate amount of approximately $50,000,000, assigned from Stanford Financial Group, Ltd. to Bank of Antigua in December 2008.  These assignments are fraudulent transfers under applicable law.

40.     In exchange for these proceeds, Antigua provided substantial assistance to, and participated in, the fraud by, among other things:  (a) adopting sham bank "reforms," which resulted in the appointment of Allen Stanford's attorney (and two other members of that attorney's firm) to a "special advisory board," on the "reform" of Antigua's banking regulations; (b) the passage of new laws that criminalized the release, by any bank employee or Antiguan regulator, of information about an Antiguan bank customer without a court order, effectively providing Stanford with a significant shield against any investigation into its fraudulent financial schemes; (c) the appointment of Allen Stanford to the position of Chairman of the newly-created International Financial Sector Authority ("IFSA"), an Antiguan entity purportedly intended to regulate offshore banks such as SIBL, and (d) the active concealment of Stanford's fraud from the SEC and other regulators.

## Seizure of the Bank of Antigua

41.    In February 2009, after the appointment of the Receiver, the ECCB seized

the Bank of Antigua and turned over ownership of the Bank of Antigua and all of its

assets to Antigua and the Bank Defendants.   A press release issued by the ECCB in

connection with the seizure stated:

> To protect the interests of depositors of the Bank of
> Antigua Ltd ('the Bank') and to preserve the stability of the
> financial system of Antigua and Barbuda, the Eastern
> Caribbean Central Bank ('the Central Bank'), in exercise of
> the emergency powers conferred on it by Part IIA, Article
> 5B of the Eastern Caribbean Central Bank Agreement 1983
> (the Agreement), which has the force of law in all member
> states of the Eastern Caribbean Currency Union, assumed
> control of the bank on the 20th day of February 2009. In
> that regard, the Central Bank took exclusive custody
> control and possession of all the funds, assets and other
> property and undertaking of the Bank wherever situated
> including funds on deposit at the bank.
>
> The Central Bank is therefore by law currently in control of
> the bank to the exclusion of the shareholder and any and all
> former directors of the institution.
>
> The Central Bank wishes to once again assure depositors of
> the bank that all measures are being taken to safeguard their
> interests and to maintain the stability of the financial
> system of Antigua and Barbuda.

42.    The seizure took place just one day after the ECCB had pronounced the

Bank of Antigua and its liquidity situation "sound."  The seizure of Bank of Antigua was

orchestrated and directed by the government of Antigua, in concert with the ECCB and

the Bank Defendants, in order to deprive CD investors – all of whom are creditors of

SIBL, Stanford, and the other Stanford Entities – of substantial value, and to ensure that

Antigua would never be required to repay its massive debts to the various Stanford Entities for the benefit of Stanford's creditors.

43.     At the time of the seizure of the Bank of Antigua by the Defendants, Antigua was indebted to Stanford in an aggregate amount of hundreds of millions of dollars.  According to the 2005 Budget Statement delivered by Antiguan Minister of Finance and the Economy, L. Errol Cort, MP to the Antiguan Parliament, Antigua's debt to Stanford at <u>that</u> time was at least $230 million and there is no evidence that all or any substantial portion of that indebtedness has ever been repaid by Antigua.  A considerable portion of that debt was owing by Antigua to the Bank of Antigua pursuant to various loans and other financial arrangements made between and among Stanford, the Bank of Antigua and Antigua over the years, including, *inter alia*, under the Bank of Antigua Loan Act of 1995 and the Loans (Mount St. John's Hospital Construction and Equipping) Act 1998.

44.     Significantly, the ECCB's seizure of the Bank of Antigua, and its delivery into the hands of Antigua and the Bank Defendants, was approved by the ECCB's Monetary Council, **which was then chaired by Mr. Errol Cort, Minister of Finance of Antigua.**  Thus, under the direction of Antigua's own Minister of Finance, Antigua overnight transformed itself from being a major multi-million dollar obligor to the Bank of Antigua to being its largest shareholder.

45.     While steadfastly publicly maintaining its lack of culpability for its role in the Stanford fraud, Antigua continues to avoid paying compensation to Stanford victims.

46.     Following considerable negative publicity relating to its Stanford-related activities, Antiguan officials finally announced what appeared to be a positive step. Antigua stated its intention to repay at least a portion of its rightful debt owing to Stanford –money stolen from CD investors and transferred by Stanford to the Government of Antigua – not to the Stanford victims, but rather to the Bank of Antigua itself.  According to Antigua's Attorney General Justin Simon in an interview broadcast on Fox Business News, the money owed by Antigua to Stanford is owing "a debt to the bank [of Antigua] so that we have to deal with it on those lines."  ***Thus, Antigua does not intend to repay Stanford's defrauded investors.  Instead, it intends to repay an entity that was seized under Antigua's direction, and in which Antigua is now the largest shareholder.  In essence, Antigua intends to use CD investors' money to pay itself!***

47.     The egregiousness of the self-serving seizure of the Bank of Antigua is compounded by the fact that, in violation of the ECCB's own governing document, the Eastern Caribbean Central Bank Agreement Act, 1983 (the "ECCB Act"),[5] Antigua and the Bank Defendants have not paid fair value – or, indeed, ***any value*** – for the Bank of Antigua and its assets.  Indeed, the ECCB Act empowers the ECCB "to acquire or sell or otherwise deal with the property, assets and undertaking of or any shareholding in the financial institution, ***at a price to be determined by an independent valuer***."  (Emphasis added.)  Upon information and belief, in violation of the ECCB Act, the ECCB has never paid to the Stanford Entities, or the Receiver, ***any*** price for the Bank of Antigua, and has

---

[5]     The ECCB Act has the force of law in all of ECCB's member countries, including Antigua.

never undertaken an independent valuation of the Bank of Antigua for the purposes of determining what price should be paid for the Bank of Antigua and its assets.

### Commercial Activity Having a Direct Effect in the United States

48.     As set forth in the pleadings in the SEC Action and demonstrated at Stanford's criminal trial, the Stanford Ponzi scheme is responsible for the theft of at least several billion dollars from Stanford's investors and customers.

49.     The actions and activities of the Bank of Antigua, Antigua, as well as the seizure of the Bank of Antigua itself had many direct effects in the United States, in large part because Stanford was based in the United States, and inextricably linked to the financial system of the United States.

50.     Moreover, the actions described above had a direct effect in the United States, in that:

>    (a)    As a result of the conduct alleged herein, and related conduct, criminal proceedings have been instituted against King in the Southern District of Texas;

>    (a)    The United States Internal Revenue Service may have a multi-million dollar claim for taxes and penalties owed to the United States in whole or in part due to the commercial activities described herein;

>    (b)    A substantial number of Stanford's customers, including CD investors, are based in the United States, and the economic effects

of those persons' tragic and substantial losses are being felt in the United States; and

(c)   Antigua's unlawful actions led to the collapse of the Stanford Entities, which were operated in Houston, Texas.

51.   Likewise, in connection with each allegation set forth above in which Plaintiff alleges that money was paid (or otherwise provided) to Antigua using funds that Stanford had stolen, each such act had a direct effect in the United States because the money at issue was being funneled to Antigua from defrauded customers in the United States, and elsewhere, through SFG's operations in the United States, at the direction of Stanford in the United States.

**FIRST CLAIM FOR RELIEF:**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**TO THE BANK OF ANTIGUA**

52.   Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

53.   Upon information and belief, prior to the seizure of the Bank of Antigua by the ECCB, the Bank of Antigua received substantial transfers of funds from Allen Stanford, SIBL, SFG, and other Stanford entities.

54.   Upon information and belief, a substantial portion of the assets loaned or otherwise invested by the Bank of Antigua, including funds loaned by Bank of Antigua to the government of Antigua, were obtained by the Bank of Antigua as a result of the fraudulent transfer of assets to the Bank of Antigua from SIBL or other Stanford entities with the purpose and effect of defrauding CD investors.

55.     Upon information and belief, the transfer of assets from Allen Stanford, SIBL, and/or SFG to the Bank of Antigua was for less than fair value, and with the purpose and intent of defrauding Allen Stanford's, SIBL's, and/or SFG's creditors, including CD investors.

56.     By reason of the foregoing, the transfers described above are ineffective as against Plaintiff.

57.     By reason of the foregoing, pursuant to the Texas Uniform Fraudulent Transfer Act, and common law, Plaintiff is entitled to avoidance of the transfers or a judgment against the Bank of Antigua in the amount of the value of the assets transferred.

## SECOND CLAIM FOR RELIEF:
## AVOIDANCE OF FRAUDULENT TRANSFER
## BY SEIZURE OF THE BANK OF ANTIGUA

58.     Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

59.     The ECCB's seizure of the Bank of Antigua and transfer of ownership of the Bank of Antigua to Antigua and the Bank Defendants was a fraudulent transfer of assets from the Receivership Estate with the purpose and effect of defrauding the CD investors.

60.     Upon information and belief, the transfer of Bank of Antigua to Antigua and the Bank Defendants was for less than fair value.

61.     By reason of the foregoing, pursuant to the Texas Uniform Fraudulent Transfer Act, and common law, Plaintiff is entitled to avoidance of the transfer of the

Bank of Antigua or a judgment against the Bank Defendants in the amount of the value of the Bank of Antigua on the date of transfer.

## THIRD CLAIM FOR RELIEF:
### CONVERSION

62.     Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

63.     As described more fully above, assets belonging to CD investors were fraudulently and illegally transferred to the Bank of Antigua and substantial portions of those assets were subsequently transferred to Defendant Antigua.  Thus, the Receiver and the Committee are the rightful owners of the assets fraudulently and illegally transferred to Bank of Antigua.

64.     As described more fully above, ECCB seized the Bank of Antigua, and Antigua and the Bank Defendants have taken control of, and asserted ownership over, the Bank of Antigua and all of its putative assets – including the assets fraudulently and illegally taken from CD investors – without paying any compensation for that taking, to the exclusion of and inconsistent with Plaintiff's rights, in violation of international law and the ECCB Act.

65.     *Further, the Bank of Antigua was seized after the Receiver was appointed, and in violation of this Court's Receivership Orders*.  *See e.g.,* Second Amended Receivership Order, Case 3:09-cv-00298-N [Doc. 1130] p. 2 (Court assuming jurisdiction over all Receivership Assets); *see also* Chapter 15 Decision, Case 3:09-cv-

00721-N [doc. 176] *passim* (Court recognizing that the Bank of Antigua is a Stanford Entity subject to the Receivership).

66.     By reason of the foregoing, investors in SIBL CDs were injured and damaged, and therefore, the Receivership Estate was injured and damaged.  On behalf of the Receivership Estate, the Committee seeks and demands restitution and judgment against ECCB and the Bank Defendants in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF:
### UNJUST ENRICHMENT

67.     Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

68.     As described more fully above, assets belonging to CD investors were fraudulently and illegally transferred to the Bank of Antigua and substantial portions of those assets were subsequently transferred to Defendant ECCB and the Bank Defendants.  Thus, the Receiver and the Committee are the rightful owners of the assets fraudulently and illegally transferred to the Bank of Antigua.

69.     ECCB and the Bank Defendants have taken control of, and asserted ownership over, the Bank of Antigua and all of its putative assets – including the assets fraudulently and illegally taken from CD investors – without paying any compensation for that taking, to the exclusion of and inconsistent with Plaintiff's rights, in violation of international law and the ECCB Act.

70.     By reason of the foregoing, ECCB and the Bank Defendants have been unjustly enriched to the detriment of the Plaintiff by taking control of, and asserting

ownership over, the Bank of Antigua and Plaintiff's assets, without paying any compensation thereof.

71.     By reason of the foregoing, investors in SIBL CDs were injured and damaged, and therefore, the Receivership Estate was injured and damaged.  On behalf of the Receivership Estate, the Committee seeks and demands restitution and judgment against ECCB and the Bank Defendants in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF:
## ACCOUNTING FROM BANK OF ANTIGUA

72.     Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

73.     By reason of the foregoing facts, Plaintiff is entitled to an accounting from the Bank of Antigua as to the assets transferred to the Bank of Antigua.

## SIXTH CLAIM FOR RELIEF:
## ACCOUNTING FROM ECCB AS TO
## VALUE OF BANK OF ANTIGUA

74.     Plaintiff repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs.

75.     By reason of the foregoing facts, Plaintiff is entitled to an accounting from the ECCB as to the value of the Bank of Antigua at the time it was seized by the ECCB.

## JURY DEMAND

76.     Plaintiff demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(i)     enter judgment in favor of Plaintiff and against Defendants:

(a) awarding all damages proven at trial;

(b) ordering the avoidance of the fraudulent transfers described herein and disclosed during the course of discovery;

(c) ordering an accounting;

(d) awarding attorney fees, and costs, as permitted by law; and

(e) granting such other and further relief as the Court may deem just and appropriate.

Dated: February 15, 2013                    Respectfully submitted,


BUTZEL LONG, a professional corporation

By: /s/ *Peter D. Morgenstern*
Peter D. Morgenstern (*pro hac vice*)
380 Madison Avenue, 22nd Floor
New York, NY 10017
Telephone: (212) 818-1110
Facsimile: (212) 818-0494
morgenstern@butzel.com


ONE OF THE ATTORNEYS FOR THE OFFICIAL STANFORD INVESTORS COMMITTEE

## REQUEST PURSUANT TO LOCAL RULE 83.10

The undersigned hereby requests leave to appear in this case without local counsel.  The undersigned has been admitted pro hac vice as counsel to the class plaintiffs in other actions pending against Antigua; is a member of and counsel to the Official Stanford Investors Committee in numerous actions; appears regularly with other duly admitted attorney-members of the Committee before this Court in connection with such matters; and is prepared to appear personally for all conferences and hearings in this action.

/s/ *Peter D. Morgenstern*
Peter D. Morgenstern